Loking, J.,
delivered the opinion of the court:
The petitioner claims against the United States the sum of $32,650, alleged to be due on a charter-party, and the court finds the facts to be—
1. That Spear and Lang were the owners of the steamer Maple Leaf, and at Boston, on the 3d September’, 1862, by a charter-party made between them and Captain McKim, assistant quartermaster, chartered the steamer to the United States for the term of one month, from September 1, 1862, and as much longer as she might be required by the United States War Department, at the rate of $550 per day, to be paid to said Spear and Lang by the United States.
2. On the 21st day of May, 1863, a circular letter was issued from the Quartermaster General’s office to the quartermasters at the various ports or posts where vessels were chartered, in which, among other things, it was stated:
“In the first operations along the coast, and in fitting out great expedition's, it became necessary to pay, for short times, prices much higher than would have been justifiable had it been *202 foreseen that tlie vessels would remain more than from thirty to sixty days under charter.
“Many of these vessels have been retained until their earnings and their profits have been excessive.
“Your attention is called to this matter, and you are directed to take stringent- measures to reduce these expenses by discharging all steamers whose rates appear to be excessive.
* # * #
“The department has invited proposals for charter and sale of steamers, proposing to replace the more costly vessels, and those whose rates are excessive, by others at lower rates.
* # #
“The ruling rates of these offers are from thirty-five to fifty •cents per day per -ton, registered measurement, for side-wheel steamers and propellers, and $3 50 to $4 per month for sailing vessels, per registered ton.”
This was sent to Captain McKim, at Boston, who had chartered the “Maple Leaf.”
3. On the 22d June, 1863, by an order of the Quartermaster -General, the rate of hire of the Maple Leaf was reduced to $300 per day from April 22, 1863, to June 22, 1863, and to $250 per day after June 22, 1863.
4. On the 19 bh August, 1863, by a second charter-party, made (in substitution of that first mentioned) by Charles Spear, agent of the owners, and said Captain McKim, assistant quartermaster, on the part of the United States, the Maple Leaf was chartered to the United States, the charter-party to go into effect .at 12 o’clock m., on the 22d June, 1863, and to continue in force -as long as the steamer might be required by the War Department.
5. The reductions of the rate of hire of said steamer above specified were made with the assent of her owners, and the -said charter, dated August 19, 1863, was made voluntarily by them, to continue said steamer in the service of the United States.
The said owners of the steamer Maple Leaf have been fully paid for the services and employment of said steamer, according to the reduced rates and the charter-party last made as above stated, and this suit is brought to recover the difference between $300 and $550 per day from April 22 till June 22,1863, and between $250 and $550 from the [latter date till the 19th *203 August, 1863, when the steamer was discharged from the service of the United States.
It was contended for the petitioner—
1st. That the reductions of the hire of the steamer were unauthorized and made without their assent and against their protest.
2d. That the second charter-party, dated August 19, 1863, was obtained by duress.
The record shows that, on the 19th November, 1862, the Maple Leaf, then at Fort Monroe, was ordered by Lieutenant Colonel Thomas to report to Captain McKim, at Boston, to be discharged, unless otherwise ordered by him $ that the captain of the steamer did not obey said order, but went to Baltimore ■and returned with a cargo to Fort Monroe in December; and that her captain stated that he had not received the order to report to Captain McKim, at Boston, for discharge.
These facts are stated in an official letter, dated at Fort Monroe, June 10, 1863, addressed by Colonel Thomas to Captain McKim, at Boston, and recommending that the steamer be not paid for her services till her non-compliance with his order be satisfactorily explained, and then only at a reduced rate. This letter Captain McKim referred to Mr. Charles Spear, who made the following reply:
u Boston, June 15, 1863.
“Sir: To the letter of Colonel Thomas, quartermaster at Fortress Monroe, of the 10th, to you, I have to reply that I am very much surprised at its contents.
“ The captains of all the steamers for which I am agent have positive instructions to obey fully, in every particular, the orders of the quartermaster in whose department they may be, and the captain of the Maple Leaf is a high-minded, honorable gentleman, brother of S. H. Dale, esq., the present mayor of the city of Bangor, and is well known in this city and vicinity, and is totally incapable of ignoring the order referred to, and I am fully convinced that it could not have been presented to him; and yet I cannot question the statement of Colonel Thomas, and I should be truly g’la'd, and will endeavor, to get at an explanation of the matter.
“ Bespecting the price per day of the Maple Leaf, I have to say that,, at the time she was chartered, the price paid was not *204 high, in comparison to other steamers, in view- of her capacity for passengers and freight and her qualities as a sea steamer, and I think he is in error when he says that steamers equal to her in every respect are under charter at from two to four hundred dollars per day. I do not question the fact that steamers, that will carry as many men as she will are now in the service at the latter price, but men are all they can carry, while the Maple Leaf will carry men and cargo also, and the steamers referred to are probably not as suitable to go outside of the Gapes as the Maple Leaf, which is adapted for any voyage.
“ But, if it is fully decided that the charter of the Maple Leaf is too much, I am perfectly willing to agree to any equitable arrangement in the premises.
“.Recently this steamer has been placed in the hands of Messrs. E. A. Souder & Co., of Philadelphia, and their Mr. Getty is well known by General Meigs; and either Mr. Getty or myself, or both, will meet you or Colonel Thomas, or General Meigs, and adjust this as above; and I do not for a moment entertain a doubt but that a very short interview will suffice to arrive at an equitable arrangement.
“ I remain, dear sir, respectfully yours,
“CHAS. SPEAR,
11 Agent for Owners.
“Captain W. W. McKim,
“Assistant Quartermaster U. 8. A., Boston, Mass.
“A true copy:
“WM. W. McKIM,

“Captain and Assistant QuartermasterA

So that, as early .as June 15,-1863, Mr. Spear knew that a reduction of the original charter-party was required by the government, and he declared his readiness to concur in that and keep his steamer in the service, and proposed that the rate of reduction should be adjusted by him and Mr. Getty, in conference with the officers of the Quartermaster’s Department.
On the 2211 June, 1863, Colonel Clary addressed to Captain McKim the following order:
“Quartermaster General’s Oeeice,
“ Washington, JO. C., June 22,-1863.
“Captain: The account of the steamer Maple Leaf for services from March 1 to March 16, 1863, both dates inclusive, at- *205 $550 per clay, is herewith referred, to you for payment, in accordance with the evidences of service inclosed; also the account from February 1 to 28, 1863, inclusive, in like manner referred. You will please cause a new charter-party to be executed with the owners of the Maple Leaf, to take effect from June 22,1863, inclusive, at the reduced rate of $250 per day, using the latest form of charter-party, at a valuation of $50,000 and at a rate of profit of 33 per cent.
“ Very respectfully, your obedient servant,
“ By order:
“R. E. CLARY,

u Colonel and Quartermaster.

“Captain W. W. MoKim,
“ Quartermaster, Boston, Massachusetts.”
And on the same day, (June 22, 1863,) Colonel Clary addressed to C olonel Thomas, at Fort Monroe, where the Maple Leaf then was, the following order:
“ QuakterMAstek Gekekal’s Oeeice,
“ Washington, I). C., June 22, 1863.
“Sir: The rate of the steamer Maple Leaf is hereby reduced to $300 per day from April 22, 1863, to June 22,1863, and still further reduced to $250 per day after June 22, 1863.
“You will please cause certificates of service to be made out for the time she has served tinder the old rates, tip to date, and forward' them to the proper parties iimnediately, so that the accounts may be adjusted as soon as possible.
“ Respectfully, your obedient servant,
“ By order:
“R. E. CLARY,
“ Colonel and Quartermaster.
“Lieutenant Colonel C. W. Thohas,

“Assistant Quartermaster TT. S. A., Fort Monroe, Va.”

And, on July 30, 1863, Mr. Spear receipted, at Boston, for the services of the steamer to June 22,1863, at $300 per day, according to the above-mentioned order of reduction. The owners knew then, therefore, of the rates of reduction ordered by the department.
In August, 1863, Mr. Spear and Mr. Getty, whose firm had advanced money to the owners on the charter-party, came to • Washington, and there, in various interviews with General *206 Clary, running through, ten days, sought an adjustment with the government, in which they contended for the original charter price of $550 per day, anti labored for the best terms the5' could get; and Colonel Clary adhered to the order given, which was finally acceded to by the owners. Of this, Mr. Getty, who-conducted the negotiations for the owners with the privity of Mr. Spear, says:
“ Finding that nothing else could be done, we agreed to receive what he was willing to give us, and consented to the execution of this new charter-party. I considered it the best terms these claimants could get. We had advanced money to-them upon this charter of the Maple Leaf as our own security,, and we wanted our money; therefore we advised them to accept the terms offered.”
The case claimed by the petitioner rests on Mr. Getty’s statements of what passed between him and General Clary in the ten days of negotiation, and General Clary denies Mr. Getty’s-statements. These, therefore, are not proved, and they are improbable and, in every case but one, immaterial.
Mr. Getty states that General Clary refused to pay the amount-due and payable at the reduced rates unless the owners would execute the second charter-party. This would require strong-evidence, but it rests only on Mr. Getty’s, and General Clary states expressly that the consent of the owners was obtained in all cases where the vessels were continued in the service.
And it is perfectly clear, on Mr. Getty’s testimony, that lie-made no request for the discharge of the vessel, but avoided doing so, for he testifies that he told General Clary that the-proper procedure for the government, if it refused to pay the original charter price of $550 per day, was to discharge the vessel and then offer another charter-party. But, if the discharge of the vessel was a right of the owners, they had an election as to that, and it was for them to exercise it by a demand of her discharge, and they had already declared that they preferred her employment at a reduced rate.
And the result of the whole case is that the owners, by-Charles Spear’s letter of 15th June, proposed to the government to leave their vessel in the service at a reduced rate, which they should adjust thereafter with the officers of the Quartermaster’s Department; that afterward the rate, and nothing but the rate, was made by the owners the subject of a *207 negotiation, and in that, without requiring the discharge of the vessel or any suggestion that they wished it, they agreed to and accepted the reduced rate, on which the vessel was continued in the service.
And our conclusion in this ease is on its facts, which are unlike those of any preceding case. •
And, on the whole case, it is adjudged that the defendants-are entitled to judgment and that the petition be dismissed.